

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-1995

# Versa v Bifold Company

Precedential or Non-Precedential:

Docket 94-5064

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Versa v Bifold Company" (1995). *1995 Decisions.* Paper 50.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/50

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 94-5064
_____

VERSA PRODUCTS COMPANY, INC.

v.

BIFOLD COMPANY (MANUFACTURING) LTD.,

Appellant

_____

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 93-cv-02734)

_____

Argued: May 12, 1994

Before: BECKER and LEWIS, Circuit Judges, and
POLLAK, District Judge.*

(Filed  February 15, 1995)


NORMAN H. ZIVIN, ESQUIRE (ARGUED)
PETER D. MURRAY, ESQUIRE
WENDY E. MILLER, ESQUIRE
Cooper & Dunham
1185 Avenue of the Americas
New York, NY  10036

ROBERT M. AXELROD
Sills, Cummis, Zuckerman, Radin
Tischman, Epstein & Gross, P.A.
One Riverfront Plaza
Newark, NJ  07102-5400
        Attorneys for Appellant

_____

    *.    The Honorable Louis H. Pollak, United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

JEFFREY CAMPISI, ESQUIRE (ARGUED)
Sharkey & Campisi
188 Eagle Rock Avenue
P.O. Box 419
Roseland, NJ  07068
        Attorneys for Appellee

---

**OPINION OF THE COURT**

---

BECKER, Circuit Judge.

This is a trade dress infringement action in which plaintiff Versa Products Company, Inc. ("Versa") contends that defendant Bifold Company (Manufacturing) Ltd. ("Bifold") infringed the trade dress of Versa's B-316 directional control valve, a device commonly used in control panels of offshore oil-drilling rigs to facilitate emergency shutdowns, by marketing its Domino Junior valve, which Versa maintains copies the product configuration of the B-316.[1]  The action was brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (West Supp. 1994), New Jersey's Unfair Competition Law, 56 N.J.S.A. § 4-1 to -2 (1989), and New Jersey's common law of unfair competition.  Following a bench trial the district court found that the trade dress of Versa's valves had met the nonfunctionality and distinctiveness requirements of our trade dress jurisprudence, and that there was

---

[1].    As in Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431, 1439 (3d Cir. 1994), "we will employ the designation `product configuration' to refer to trade dress alleged in the product itself, whether in a specific feature or in some combination or arrangement of features, and to distinguish that type of trade dress from `product packaging.'"

a likelihood of confusion of the sources of Bifold's Domino Junior and Versa's B-316 valves. Accordingly, the court entered a permanent injunction against Bifold, precluding it from selling its Domino Junior valve (in its present form) anywhere in the United States. Bifold appeals all aspects of the district court's rulings.

We need not reach the nonfunctionality and distinctiveness questions because the appeal may be disposed of on the likelihood of confusion issue, in connection with which we are called upon to determine whether the jurisprudence that lowers the standard to a "possibility of confusion" where the alleged infringer is a "second comer" applies in the trade dress product configuration context. We also must explicate the elements of the confusion standard in this context. We conclude that the lowered standard (applied by the district court) does not apply and that some but not all of the "Scott factors," see Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225 (3d Cir. 1978), are pertinent, because of policy considerations applicable in product configuration cases. Applying this approach we conclude that the district court's finding of a likelihood of confusion is clearly erroneous. We will, therefore, reverse the order of the district court and vacate the permanent injunction.

I.  FACTS AND PROCEDURAL HISTORY

Versa, a New Jersey corporation with subsidiaries abroad, designs and manufactures pneumatic and hydraulic directional control valves.  Bifold, an English corporation, competes with Versa and markets a line of control valves and related products and services to the offshore oil industry.  Versa alleges that Bifold has engaged in unfair competition in its marketing of the Domino Junior -- a valve manufactured by Bifold and adapted to the harsh offshore oil and petrochemical environments -- by copying the trade dress, i.e., the distinctive appearance, of the product configuration of Versa's B-316 valve.

The most significant feature of valves designed for offshore applications is their stainless steel composition, used to withstand the corrosive effects of salt air and sour gas fumes. In offshore drilling platforms these valves are typically aligned in small control panels containing up to fifty modular valve bodies with a standard configuration but which, by attaching one of various actuators and making minor adjustments, may be adapted to a variety of applications.  The panel design engineers devise the functional specifications of panels around the capacities of particular valves, selecting valves based on their functionality, reliability, availability, and price.  The valves themselves are not visible from the front of a control panel when installed; only knobs, buttons, and status indicator actuators protrude.

## A.  Versa's B-316 Valve

Versa began producing brass valves (its "V" series) in 1949. Versa dresses the series, consisting at present of an entire line of valves well known in the industry, with contoured lines and shaping that the district court found "form a distinctive product appearance that has been associated with Versa for decades."  In the late 1970's Versa designed the B-316 line of stainless steel valves, the subject of this litigation.  Versa initially fashioned them of stainless steel bar stock, and the valves were plain and unadorned.  Because of the waste of valuable metal associated with the machining process and the substantial manual labor needed to drill each valve individually, Versa converted to a cast version of the valve as soon as sales levels justified the substantial economic investment in a casting mold.

The two versions of the valve serve the same function and are interchangeable.  Versa deliberately set about to give the cast version of the B-316 the "Versa look," that is, to have it resemble in appearance the V-series of Versa valves.  FF 41. Versa's desire to have the valve be clearly associated with Versa in the market was a primary impetus for its election to manufacture the cast version of the B-316.

The modular B-316 valve is comprised of a valve body and, optionally, one or more attached actuators used to manipulate the moving parts in the valve body.  The valve is a three-way valve, meaning that it has three ports or openings (for the ingress or

egress of gas or fluid), which are threaded to ¼" NPT, a national standard and industry requirement.  The ports open into an inner chamber in the valve body, which houses a spool moved by an actuator (such as a button, knob, or electronically controlled solenoid actuator) to open or close the port, controlling fluid flow.

The configuration and function of the actuators provided with a valve are driven by customer demand; however, the use of certain actuators (most of which Versa purchases from other vendors) is standard with the B-316.  Versa has used the same knob actuator for 40 years, although many others are available. It also uses a particular status indicator, which indicates the valve's position; a particular button actuator, which is shrouded to prevent accidental actuation; a self-produced manual latch, which locks the valve spool in the open or closed position; and a self-produced pilot actuator, which responds to pressure in an attached fluid line to control the spool's position.

Located at each end of a valve is a flange, both of which serve as faces to mount the actuators and to provide a flat surface for attachment to the control panels; holes are drilled into the flanges to allow the actuators to be securely mounted. A longitudinal top rib runs along the top of the valve body to allow customers to attach solenoid (computer controlled) actuators, to provide strength, and to serve as a casting gate (an opening in the casting mold through which the molten metal is

poured). A smaller bottom rib was added to provide parallelism in the product's appearance and to assist in the casting process. Finally, the valve has three mounting holes which are positioned to provide stable mounting to a panel or other flat surface. Each aspect of the valve serves a specific function essential to the valve's operation, cost, performance, or ease of manufacture. The design of each actuator is functional. Functionality dictates the overall cast design, but does not dictate its external appearance.

The B-316 valve's mold imprints the manufacturer's name ("VERSA") and place of origin ("N.J. U.S.A.") on the valve. Versa also stamps a date code and rivets a metal label displaying the Versa name, logo, and part number onto the valve. Versa currently dominates the United States market for stainless steel valves. Aside from Bifold, only Versa sells cast stainless steel valves; other competitors use a cylindrical bar stock.

### B. Bifold's DOMINO JUNIOR Series Valve

As part of Bifold's continuing efforts to expand its product line, in 1985 it introduced the Domino series modular valves. Although originally machined from standard bar stock (like Versa's B-316), the Domino valves became sufficiently successful to warrant the investment needed to design a cast version. An outside casting company designed the cast version of the Domino; Bifold had no involvement in the process. Like a B-316, the Domino valve has three cylindrical ports, a top rib for housing a solenoid feed, flanges, and a range of actuators.

Because the Domino was too large for many of its customers' needs, however, Bifold designed the "Domino Junior" modular valve in 1990, producing it at first from bar stock.[2] In late 1991, eight years after the cast version of the B-316 became available, Bifold introduced its cast version of the Domino Junior. Bifold at the time erroneously believed that Versa had a "monopoly" on the wellhead control panel valve market, and created the cast version of the Domino Junior to "bury Versa."

Bifold was aware of the B-316's appearance and design features because it had seen the product at various trade shows. The district court did not credit Bifold's claims that it designed the Domino Junior as a scaled down version of the Domino

---

[2]. A fact-finding inconsistent with the tenor of the ones described here is that "Bifold used the Domino Junior bar stock valve as an excuse to justify its look-alike cast version of the Domino Junior product."

and that it did not copy the B-316.[3]  It found instead that, before and during its design of the Domino Junior cast mold, Bifold examined and largely copied Versa's B-316 valve, a sample of which it had obtained through its agent in Denmark.  For example, the court found that Bifold, which regularly uses metric sizes in its valves, took measurements from the B-316 and used a metric conversion of the B-316's imperial standard size.  Bifold also sent a cast B-316 valve to Manchester Tool Services, which it selected to be the manufacturer of the cast version of the Domino Junior, as a model for the cast version of the Domino Junior.  The two valves (the B-316 and the Domino Junior) are not, however, interchangeable in the field, and "replacing a Versa B-316 cast valve with a Bifold Domino Junior cast valve in an existing control panel could be problematic."

The district court also found that Bifold lacked the expertise to design the cast version of the Domino Junior, had presented misleading testimony about who produced a prototype drawing of the Domino Junior, and had backdated documents to create the false appearance that it had designed the valve.  The court found that BSA Precision Castings, Ltd. ("BSA"), which had designed the cast version of the Domino valve, was involved in the design of the cast version of the Domino Junior valve. During the time that BSA participated in the design of the cast version of the Domino Junior, it had in its possession drawings

---

[3].    It also did not credit the claims of Bifold's experts.

and castings of the B-316's major components, as well as Versa's actuators. BSA had obtained the drawings, actuators, and actual samples of valve components from Versa three years earlier when it had provided Versa with a quote for the casting of the B-316. The court found that BSA used this data to design a casting of the Domino Junior valve as a look-alike of the Versa B-316, despite the fact that Bifold had asked BSA to give "due consideration to the appearance of the larger Domino valves."

Although the Domino Junior and B-316 do, in fact, look quite similar, the district court described a number of differences between the two manufacturers' valves. Because the Domino Junior's ports extend outward from the valve body, whereas the B-316's ports are flush with the valve body, the Domino Junior is slightly wider than the B-316. The Domino Junior ports' threads have metric dimensions. The Domino Junior is made of more metal and weighs about thirty percent more than the B-316. The stroke -- the distance an actuator must move the internal spool to switch the valve's ports -- also differs from that of the B-316. Because Bifold electroplates its valves, the Domino Junior body has a duller finish than the B-316. The Domino Junior also has thicker flanges and ribs than does the B-316. The valves' mounting holes have different centers. Bifold purchases its status indicators from a different company than Versa uses, and these indicators have a different size, appearance, and configuration from Versa's. Like Versa, Bifold produces its own

manual latch, but makes it out of two cast pieces and gives it rounded edges, whereas Versa uses a single piece of rectangular bar stock material.

The Domino Junior valves are "block-before-bleed" (meaning fluid flow is completely blocked during the moment required to change states when the valve is activated), whereas the B-316 includes that feature only as an option. The Domino Junior ports are universal (meaning that any port can be an inlet or an outlet port), though Bifold customizes each valve as either normally open or normally closed; in contrast, Versa offers universal application only as an option. Like Versa, Bifold casts its name into the Domino Junior's valve body and bolts onto it a metal label prominently displaying the Bifold name.

Despite all these differences, the court concluded that "[t]he Bifold Domino Junior valve and actuators are virtually identical in external design and visual appearance to the Versa B-316 valve." It found an identity in general body configuration, body length, flanges, distance between ports, valve mounting holes, actuator mounting holes, ribs, spring cap (which returns the spool back to its original position), buttons, button caps, status indicators, knobs, manual latching pins, and pilot caps. The valve bodies, buttons, button caps, knobs, status indicators, and manual latching mechanism used by other competitors in the industry look quite different from both the Domino Junior's and the B-316's. The court discounted the

dissimilarity of the solenoid actuators attached to the valve bodies by Versa and Bifold because only a small portion of Versa's B-316 valves sold include solenoid actuators.

### C. Marketing and Sales of the Valves

In order to determine whether Bifold had engaged in unfair competition with Versa, the district court considered whether consumers were likely to confuse the sources of the two companies' valves in light of the ways in which the two valves are marketed and sold. The court found that valves of this sort are not sold off the shelf or selected on sight. Rather, both manufacturers sell their valves based on functional specifications detailed in schematic diagrams, manufacturers' catalogs, or specification sheets and samples available at trade shows and sales presentations. The valves are selected by multi-digit part numbers identifying the particular variation desired. The purchasers and users of the valves are qualified, knowledgeable persons who comprehend the installation and use of the valves. They typically prepare specifications designating which manufacturer's valve they prefer to use in their system before placing the order.

Versa, the more established manufacturer, has sold over 100,000 B-316 valves, and is currently selling over 16,000 per year. This gives it a fifty to fifty-five percent market share of valves sold for use in emergency shutdown systems in the United States. Bifold has only recently begun marketing its

Domino Junior valve in the United States, and immediately stopped its efforts to open the United States market pending the outcome of this litigation.

Versa and its B-316 valve have an excellent reputation for producing a high quality product. This quality level is very important in emergency shutdown offshore drilling, for the failure of a valve could cause loss of human life and property as well as severe environmental damage. Versa has therefore subjected its B-316 valve to rigorous quality control tests, and the valve has performed faithfully in the field.

The district court found that, because of the availability and outstanding reputation of the B-316 cast valve for over ten years, the overall appearance and contours of the B-316 have come to distinguish the valve as Versa's (in the industry and to Versa's customers), with the valve body constituting the most defining aspect of the Versa look. The valve's overall appearance assists Versa in marketing its product, and Versa features this appearance widely in trade journals, catalogues, brochures, bulletins, trade shows, and sales exhibitions. The court also found that Versa deliberately created the B-316's distinctive appearance (contrasting with the other valves available in the market at the time) to identify the valve in the market as a Versa product.

The district court found that Bifold hired Versa's former regional marketing manager of six years, James Carr, III, to sell

its new Domino Junior valve.  Carr sells both Versa and Bifold valves, sometimes to the same customers.  To solicit Domino Junior sales in early 1993, Carr approached Gordon Fraleigh, an employee of the Fraleigh Company, which for years had sold Versa products to customers in the petroleum industry.  Carr represented to Fraleigh, whom he had known for many years, that Bifold had developed an "exact copy" of the B-316 which would "fit in perfect" as a substitute for the B-316, and inquired whether Fraleigh would like to distribute the Domino Junior.  Thereupon, Fraleigh became confused as to the relationship between Versa and Bifold.  Bifold has also contemplated contacting other Versa distributors to sell its valves.

## D.  Likelihood of Confusion

Beyond the confusion on Fraleigh's part, the district court found that some, but not all, consumers of the B-316 valves are sophisticated, and that the likelihood of confusion as to the source of the Domino Junior is enhanced with respect to the unsophisticated consumers.  This finding is undercut by the district court's finding, see supra p.12, that the purchasers are knowledgeable and understand the valves.  We note, however, that these findings might be resolved by noting that the latter finding assumes expansion of Versa's market.  Indeed, the opinion later suggests that any unsophisticated consumers exist only as "potential new customers" in "untapped" markets, that is, that all the current customers are sophisticated.  See Mem. Op. at 90.  Because there will in those potential expansion markets be no likelihood of confusion based on the district court's theory (namely, that consumers familiar with Versa's trade dress will mistakenly believe Bifold is affiliated with Versa, see infra at 68-74), we will ignore the court's "expansion" finding and consider only its finding that the purchasers are knowledgeable.

In addition, one customer forwarded to Bifold a telefax initially addressed to Versa.  And Frank Vetter, a Vice President and Chief Operating Officer of Versa, testified that he was advised of confusion of the products at trade shows.

Because of the valves' "virtual identity in appearance" and the fact that Bifold has not sold products in the United States

previously, the district court concluded that a Versa customer in the United States might reasonably assume that Versa and Bifold are related companies or that the Domino Junior is otherwise related to Versa. However, since Bifold had sold only two valves in the United States, both to distributors, the court found there had been little opportunity for Versa to document instances of actual confusion.

## II. THE DISTRICT COURT'S LEGAL CONCLUSIONS[4]

The district court noted at the outset that Section 43(a) provides a cause of action for unprivileged imitation of trade dress -- defined as the "overall design or appearance of a product or its packaging" -- because it involves actual or potential deception. Trade dress, it held, consists not of individual features, but of the overall appearance of the product. We turn then, to the court's more specific legal conclusions.

Recognizing that unpatented functional features may be freely copied regardless of any likelihood of confusion -- and Versa has not patented the design of its B-316 valve -- the district court first concluded that the trade dress of the B-316

---

[4]. Subject matter jurisdiction was grounded in the federal question statute, 28 U.S.C.A. § 1331 (West 1993), since Versa's cause of action arises under Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (West Supp. 1994). Personal jurisdiction was based on the defendant's consent. The court exercised supplemental jurisdiction over plaintiff's pendent state law claim.

was nonfunctional. The court next concluded that the B-316's trade dress was "inherently distinctive,"[5] or, in the alternative, possessed acquired distinctiveness because it had acquired secondary meaning.[6] The distinctiveness finding is problematic because the district court evaluated inherent distinctiveness using a legal standard that this court has since held to be improper. See Duraco Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431, 1441-42 (3rd Cir. 1994) (rejecting the trademark distinctiveness taxonomy as the measure of inherent distinctiveness for trade dress in product configurations). And although we can scarcely blame the district court, whose analysis of functionality largely tracked this court's various legal formulations, its finding of nonfunctionality is also problematic in view of the conflicting formulations of functionality used, as

---

[5]. The court concluded that the trade dress was inherently distinctive because it was "arbitrary," meaning it was "not dictated by functional considerations" (which appears to be the same standard that the court employed for its functionality inquiry).

[6]. "Secondary meaning" denotes that the purchasing public associates the design of the product with a particular source. Secondary meaning need be proven only if the product is not inherently distinctive. The court held that secondary meaning was established by the length and continuity of the plaintiff's use -- here, continuously for 10 years; by the strength of the buyers' mental associations -- here, purchasers associate the appearance of the B-316 with Versa; by the extent of sales and advertising -- here, Versa has sold tens of thousands of B-316 valves and has advertised widely; and, most persuasively according to the district court, by the evidence of intentional copying.

outlined in the margin.[7]  Although we have misgivings about these two issues, it is the district court's third conclusion that forms the focus of our opinion today.

_____

[7].     The district court determined that a product feature is functional if and only if "it affects their purpose, action or performance, or the facility or economy of processing, handling or using them."  Treating functionality as a matter for fact finding, the court placed the burden on Versa to show that "its trade dress serves no purpose except to identify Versa."  But then it held that trade dress is functional only "if it is essential to the use or purpose of the article or . . . affects the cost or quality of the article," that a design is "essential" "only if it is dictated by the functions to be performed," and that a design is "essential to [an item's] use" only if the particular design of the whole assembly is essential (internal quotation marks omitted, emphases supplied).  The court's inquiry thus focused on the extent to which the design feature was related to the usefulness of the product.  Then, setting forth yet a third standard, the court held that a product design is nonfunctional if, viewed as a whole, the design "primarily serves a legitimate trademark purpose -- identifying the source of the product -- . . . even though it might also serve functional purposes" (internal quotation marks omitted).
        The several standards for functionality described by the district court reflect varying articulations found in opinions of this court.  Compare, e.g., Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., 963 F.2d at 635 ("`Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification.'") (quoting SK&F, Co. v. Premo Pharmaceutical Lab., Inc., 625 F.2d 1055, 1063 (3d Cir. 1980)) with Merchant & Evans, Inc., 963 F.2d at 634 ("`[T]he question is whether a particular feature of a product is substantially related to its value as a product or service, i.e., if the feature is a part of the "function" served, or whether the primary value of a particular feature is the identification of the provider . . . .'") (quoting United States Golf Ass'n v. St. Andrews Sys., 749 F.2d 1028, 1033-34 (3d Cir. 1984)).
        The district court concluded that although a large number of the B-316's features were functional, their combination into a particular form was not.  It found that the B-316 valves' overall design did not result from "significant cost and manufacturing considerations," and that if the appearance of the B-316 were altered, "nothing of substantial value in the product [would be] lost."  In sum, the district court found that "[t]he appearance

The district court held that to prevail on a trade dress infringement claim, a plaintiff must demonstrate a likelihood of confusion, but not actual confusion. It held that Versa could do so here if it could show that an appreciable number of buyers are likely to become confused as to the origin of the Domino Junior valve. Importantly, the court further held that the threshold for likelihood of confusion is lower when a newcomer (or "second comer") violates a long-established trade dress.

The district court then seemed to apply the ten factors for likelihood of confusion that this court enumerated in Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225 (3d Cir. 1978). See CL 57. Under Scott, the threshold issue is the question of similarity of product appearances, and the court found that the Domino Junior's appearance was "virtually identical" to the B-

(..continued)
of the Versa B-316 valve presents a particular combination and arrangement of design elements that are original to plaintiff's valve, that identify it as a valve of Versa . . . and that distinguish it from other valves. This arrangement of features is not required by the function of the valve itself and is entitled to protection." Pointing to other competing valves, the court found that Bifold could compete with Versa's B-316 without copying Versa's particular configuration.
A party entering a market, the court continued, has a duty "to so name and dress his product as to avoid likelihood of users confusing it with the product of the first comer." Since, in its view, Bifold had overtly and intentionally copied Versa's trade dress in direct competition with Versa, the court concluded that Bifold had infringed Versa's trade dress and engaged in unfair competition. While Bifold could produce a valve with three ports with modular actuators and solenoid feeds, the court said, Bifold could not copy the particular, arbitrary combination and arrangement of design elements that identify and distinguish Versa valves.

316's and hence that there was a likelihood of confusion. The district court reasoned that Bifold's clear designation on the product that it was the manufacturer, while relevant to Bifold's duty to take reasonable steps to prevent deception, was only one factor to be assessed in resolving the confusion issue.

The district court found that "[a]n intent to copy trade dress and/or finding of copying by a junior user is often alone dispositive of a finding of likelihood of confusion," and that since Bifold had copied Versa's design there was a likelihood of confusion. The court also found a likelihood of confusion because of the "competitive proximity" of the goods, which "strongly favors a finding of confusion," since the court found that the Domino Junior can replace the B-316 at the point of conception of the panels.[8]

Although the district court concluded that Versa was not entitled to damages because Bifold had only sold two of its valves in the United States, it granted Versa permanent injunctive relief on the ground that the company's good will was threatened by Bifold's attempt to reap the benefits of Versa's reputation (by basing the appearance of the Domino Junior on a

---

[8]. The court additionally considered the "strength" of Versa's trade dress, evidence (albeit slim) of actual confusion, the method in which the valves are sold, and the labeling of Bifold's Domino Junior. Finally, the court also essentially held that New Jersey's Unfair Competition Law, 56 N.J.S.A. § 4-1 to -2 (1989), and its common law of unfair competition parallel the unfair competition cause of action under Section 43(a), and hence that Versa prevailed on those causes of action as well.

Versa product).  The court determined that the injunction had to cover not only the appearance of the article actually the subject of the lawsuit, but also all "confusingly similar" appearances. It therefore crafted an injunction enjoining Bifold from manufacturing, selling, etc., any <u>cast</u> valve which "has an external design and visual appearance confusingly similar to the cast Versa B-316 valve, described herein and shown in Exhibit A." Order and Injunction at 5.[9]

The court then held Versa to be entitled to attorneys' fees. Recognizing that attorneys' fees can be awarded to the "prevailing party" only in "exceptional cases," the court found Bifold's deliberate and willful infringement to be exceptional. This appeal followed.  We have jurisdiction under 28 U.S.C. § 1132.

---

[9].    The court concluded its opinion with the caveat that, should its injunction be overturned, "an alternate albeit less efficacious course can be considered," namely, attaching a metal label providing "made in England" and "not a Versa product" onto the Domino Junior.  Mem. op. at 92 n.3.

### III. DISCUSSION

To obtain trade dress protection for the B-316 under section 43(a) of the Lanham Act, Versa had to prove that (a) the design was non-functional, (b) the design was inherently distinctive or distinctive by virtue of having acquired secondary meaning, and (c) there was a likelihood of confusion. See Two Pesos, Inc. v. Taco Cabana, Inc., 112 S. Ct. 2753, 2758 (1992).[10] As discussed supra, the district court found that Versa had met each of these requirements, and it therefore permanently enjoined Bifold from copying the B-316's trade dress and ordered Bifold to pay attorney's fees. We limit our discussion to the final element Versa needed to establish to prevail on its trade dress infringement claim -- the likelihood of consumer confusion as to the source of Bifold's Domino Junior.

Such consumer confusion is, of course, at the heart of trademark law. See, e.g., Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d 148, 151 (3d Cir. 1984). Likelihood of confusion is a factual matter, subject to review for clear error, see Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., 747 F.2d 844, 851 (3d Cir. 1984), which exists when, "giving all due deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence," Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1445 (Fed. Cir. 1984) (emphasis

---

[10]. New Jersey statutory and common law of unfair competition require essentially the same elements. See SK&F, Co., 625 F.2d at 1065.

omitted) (citing Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 855, 102 S. Ct. 2182, 2188 (1982)), we are "left with a definite and firm conviction that a mistake has been committed," Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985).

### A. "Likelihood" vs. "Possibility" of Confusion

Generally, "the law does not require that a competitor insure against all possible confusion or the likelihood thereof." CHARLES E. MCKENNEY & GEORGE F. LONG, III, FEDERAL UNFAIR COMPETITION: LANHAM ACT § 43(A) § 3.08[1], at 3-71 (1989, Release #5, May 1994) [hereinafter MCKENNEY & LONG, FEDERAL UNFAIR COMPETITION]. Rather, a plaintiff may prevail in a trade dress infringement action only if it shows that an appreciable number of ordinarily prudent consumers of the type of product in question are likely to be confused as to the source of the goods. See, e.g., Nikon, Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir. 1993); West Point Mfg. Co. v. Detroit Stamping Co., 222 F.2d 581, 589 & n.2 (6th Cir. 1955). "The mere possibility that a customer may be misled is not enough." Surgical Supply Serv., Inc. v. Adler, 321 F.2d 536, 539 (3d Cir. 1963).

Although this usual formulation of trade dress infringement requires a showing of a likelihood or probability of confusion, this standard has been relaxed in some cases. Where an alleged infringer was new to an area and the plaintiff was well-established, this court has at times replaced the "likelihood of

confusion" requirement with a lower "possibility of confusion" standard. These cases have all involved actions for trademark or tradename infringement, not trade dress, and certainly not trade dress alleged in a product configuration. See Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., 963 F.2d 628, 637-38 (3d Cir. 1992) (considering "possibility of confusion" with respect to "a name or mark," in particular, a "`Z' logo" alleged to be confusingly similar to a "`Zip-Rib' trademark"); Country Floors, Inc. v. Partnership Composed of Gepner & Ford, 930 F.2d 1056, 1065 (3d Cir. 1991) (directing application of "possibility of confusion" standard to "Country Tiles" and "Country Floors" names or marks); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 908-09 ("a case of a first coined word and a second coined word resembling it"). We must therefore consider whether the "possibility of confusion" standard should govern product configuration trade dress cases. Since unfair competition law regarding product configurations will diverge substantially in its incidents from the law regarding product packaging, Duraco, 40 F.3d at 1439, we begin our consideration by examining the rationale underlying the "possibility of confusion" cases.

Telechron, Inc. offered some explanation for the lowering of the requirements for showing trademark infringement in certain situations. In that case the plaintiff used the name "Telechron" starting in 1919 as a trademark for its electric clocks and other timing and switching devices. The defendant Telicon Corporation

began marketing radio and television sets under the "Telicon" name for the first time in 1946. Agreeing with the district court, this court held that "`Telicon' is a colorable imitation of `Telechron' within the conception of trade-mark infringement." Telechron, Inc., 198 F.2d at 908.

In an opinion by Judge Hastie, the court explained that the "`degree of resemblance necessary to constitute an infringement is incapable of exact definition.'" Telechron, Inc., 198 F.2d at 908 (quoting McLean v. Fleming, 96 U.S. (6 Otto) 245, 251 (1877)). We emphasized the strong aural similarity of the marks and the evidence of actual confusion, concluding that the evidence was "adequate substantiation of tendency to confusion inherent in the obvious similarity of the words themselves." Telechron, Inc., 198 F.2d at 908. Only then, expressly as an additional consideration, did we observe that this was "a type of case where a court properly requires the second comer to stay clearly away from the original mark," and thus that "`any possible doubt of the likelihood of damage should be resolved in favor of the [first user].'" Id. at 908-09 (quoting Lambert Pharmacal Co. v. Bolton Chem. Corp., 219 F. 325, 326 (S.D.N.Y. 1915) (Learned Hand, J.)).

We recognize that application of the "keep clear" policy embodied by the trademark "possibility of confusion" standard would not be entirely senseless in the context of alleged infringement of trade dress, even where the dress consists not in

a product's packaging but in a <u>non</u>functional product configuration. To the extent that product configurations are protectable, a Johnny-come-lately copier arguably creates a greater risk than one who more promptly markets a copy that consumers will be misled by a substantially identical configuration into thinking the newcomer's product to be that of the established business, for there will have been more time for the public to come to associate that configuration with a single source. In and of itself, however, that is no reason to change the measure of confusion (from "probability" to "possibility") required to make out a Lanham Act violation. Rather, it is at most a factor properly taken into account in assessing the likelihood of confusion.

The trademark "possibility of confusion" standard must therefore be supported by other considerations. We believe that the primary reasons for lowering the measure of confusion when a newcomer copies an established trademark are the general lack of legitimate reasons for copying a competitor's mark, <u>see, e.g.,</u> <u>American Chicle Co. v. Topps Chewing Gum, Inc.</u>, 208 F.2d 560, 562-63 (2d Cir. 1953) ("`Why [the defendant] should have chosen a mark that had long been employed by [the plaintiff] and had become known to the trade instead of adopting some other means of identifying its goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [the plaintiff] had built up.'"), and the high degree of reliance

by consumers on trademarks as indicators of the source of products. Whether or not these considerations translate to the realm of product packaging, we think that with respect to product configurations the significance of each of the factors is greatly diminished.

First, the mere copying of product configurations does not suggest that the copier was necessarily trying to capitalize on the goodwill of the source of the original product. See Duraco, 40 F.3d at 1453; see also infra at 40-48 (discussing implications of defendant's intent to copy). A presumption to the contrary would be mandated, if ever, only in the narrow class of cases where both (1) a product configuration is desirable to consumers primarily because of the configuration's inherent or acquired identification with the original source, and (2) the copier adopts affirmatively misleading labelling and/or marketing for the copied product, cf. Quaker Oats Co. v. General Mills, Inc., 134 F.2d 429, 432 (7th Cir. 1943) ("The pirate flies the flag of the one he would loot. The free and honorable non-pirate flies the colors of his own distinctive ensign.").

Second, although a product's trade dress in the form of its configuration could function as an indicator of the product's source, product configurations in general are not reliable as source indicators, for functional configurations are not protected and thus may be freely copied, see Duraco, 40 F.3d at 1441, 1448-49, 1451, and inherently distinctive configurations

will be rare, see id. at 1446. Since substantially identical products are often sold by different manufacturers under different names, consumers are accustomed to relying on product packaging and trademarks to identify product sources. Indeed, if any modification of the likelihood of confusion standard is justified in the product configuration context, the standard might well be heightened, perhaps to a "high probability of confusion." Nevertheless, we see no need to adopt such a standard today, preferring for now merely to reject the "possibility of confusion" standard for product configuration infringement cases, and adhering to the conventional "likelihood of confusion" standard.

B. The Scott Factors in the Product Configuration Context

Having concluded that the appropriate standard in this product configuration trade dress infringement action is a likelihood of confusion, we must determine what that inquiry entails in this context. Although the law of trade dress in product configurations will differ in key respects from the law of trademarks or of trade dress in product packaging, settled law provides the starting point for our analysis.

We stated in Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 297 (3d Cir.), cert. denied, 112 S. Ct. 373 (1991), that the analysis of the likelihood of confusion requires a court to evaluate a number of factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of [the] owner's mark; (3) the price of the goods and other factors

indicative of the care and attention expected of consumers when making a purchase; (4) the length of time [the] defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not in competition, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

Id. at 293 (citing Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978)); accord Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc., 921 F.2d 467, 474-75 (3d Cir. 1990); cf. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 (Tent. Draft No. 2, Mar. 23, 1990).  This test was developed not for product configuration cases but for "cases of alleged trademark infringement and unfair competition by a producer of a non-competing product," see Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 473 (3d Cir. 1994), and not all of the factors will be appropriate for or function the same way with respect to trade dress inhering in a product configuration, so we consider them in turn.

1.  Similarity of Appearance  (Scott Factor 1)

     In trademark infringement cases, the first and primary factor to be considered in the likelihood of confusion inquiry is "the degree of similarity between the owner's mark and the alleged infringing mark."  See Ford Motor Co., 930 F.2d at 293.  In trade dress infringement cases where product packaging is at issue, the corresponding factor is the similarity of the protectable trade dress.  Similarity of appearance is properly considered paramount in trademark and product packaging trade dress infringement cases, for unless the allegedly infringing mark or dress is substantially similar to the protectable mark or dress, it is highly unlikely that consumers will confuse the product sources represented by the different marks or trade dresses.

     For the same reason, substantial similarity of appearance is necessarily a prerequisite to a finding of likelihood of confusion in product configuration cases.  Unlike in trade mark or product packaging trade dress cases, however, a finding of substantial similarity of trade dress in a product configuration does not by itself strongly suggest a likelihood of confusion.  Consumers have grown accustomed to relying on trademarks as trustworthy indicators of the source of the product:  that is the point of a trade mark.  Perhaps to a somewhat lesser extent, consumers also rely on other aspects of product packaging to identify the manufacturer.  Such behavior is rational, for in a

trade mark or product packaging case, all the consumer usually has to go on to identify the source of the product is the trademark and packaging (and any marketing featuring that mark or packaging).

In a product configuration trade dress infringement case, by contrast, consumers do not have to rely on a potentially distinctive configuration to identify the source of the product;[11] rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's source. Accordingly, they are less likely to be confused as to the sources of two products with substantially similar configurations. Thus, in trade dress infringement suits where the dress inheres in a product configuration, the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging, and advertisements.[12] "The most common and effective means of apprising intending purchasers of

---

[11]. The product configuration may have acquired distinctiveness, or it may be inherently distinctive.

[12]. This observation is consistent with our discussion of the Scott factors (also known as the Lapp factors, after Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983)) in Fisons Horticulture, Inc., 30 F.3d at 476 n.11, where we stated: "The weight given to each factor in the overall picture, as well as its weighing for a plaintiff or defendant, must be done on an individual fact-specific basis."

the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name . . . [and when] that is done, there is no basis for a charge of unfair competition."  Venn v. Goedert, 319 F.2d 812, 816 (8th Cir. 1963), quoted in Litton Sys., Inc., 728 F.2d at 1446.

Indeed, except where consumers ordinarily exercise virtually no care in selecting a particular type of product (as may be the case with inexpensive disposable or consumable items, cf. Venn, supra (cookies)), clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration.  Cf. Bose Corp. v. Linear Design Labs, Inc., 467 F.2d 304, 309 (2d Cir. 1972) ("The presence of [the source's] name on the product [stereo speaker cabinets] goes far to eliminate confusion of origin.") (emphasis supplied); id. at 310 ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.").

## 2. Strength of the Owner's Mark   (Scott Factor 2)

In trademark cases, the strength of the owner's mark directly affects the likelihood that consumers will be confused as to the sources of products bearing substantially similar marks.  Strength includes both "[d]istinctiveness on the scale of trademarks" and "[c]ommercial strength, or marketplace recognition."  Fisons Horticulture, Inc., 30 F.3d at 479.  A strong trademark is thus one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product.  If a second comer adopts a mark substantially identical to a strong mark, there is a correspondingly high likelihood that consumers will mistakenly associate the newcomer's product with the owner of the strong mark.  The same may be said of a "strong" trade dress consisting of a product's packaging.

But these observations do not translate literally into the product configuration context.  As we have explained elsewhere, the trademark distinctiveness scale is ill-suited for application to trade dress inhering in a product configuration.  See Duraco, 40 F.3d at 1440-42.  Having rejected the distinctiveness scale in this context, we are left with commercial strength as the measure of trade dress strength in a product configuration. Yet strength of a product configuration must mean more than the ability of large numbers of consumers to identify the configuration as coming from a particular producer.  This would sanction too much

reliance by consumers on product designs that, lacking the protection of a patent, are in large measure copyable at will. Cf. Duraco, 40 F.3d at 1447-48 (criticizing the "capable of distinguishing" interpretation of distinctive trade dress).

Rather, "strength" of product configuration as relevant to determining likelihood of confusion on the part of ordinarily careful consumers should be found only if consumers rely on the product's configuration to identify the producer of the good. This may perhaps be the case with products purchased largely because of their appearance, such as "Carebears," cf. American Greetings Corp., 807 F.2d at 1142. Such focus, however, is not generally found in and should not be encouraged in the industrial design context, where product appearance typically plays a lesser role in buyers' selection processes. Hence, to differentiate between these types of product configuration cases, courts should require evidence of actual reliance by consumers on a particular product configuration as a source indicator before crediting that configuration's "strength" toward likelihood of confusion.

3.  Attention Expected of Consumers  (Scott Factor 3)

The third Scott factor is "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase."  "The greater the care and attention, the less the likelihood of confusion."  Fisons Horticulture, Inc., 30 F.3d at 476 n.12.  We believe that this factor takes on enhanced importance when a claim is made for infringement of trade dress in a product configuration, both as a result of the intersection of the patent laws with the Lanham Act, and as a function of the difference between a trademark and a product configuration.

The penumbra of the federal patent laws restricts the degree to which courts may grant legal recognition of consumer reliance on product configurations as source indicators, for their limited scope of protection impliedly imposes restraint on the workings of Section 43(a).  Accordingly, we must bear in mind the Supreme Court's counsel that "mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying . . . that which the federal patent laws permit to be copied."  Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 232, 84 S. Ct. 784, 789 (1964).[13]  "[T]he federal policy,

_____

[13].    We recognize that we deal here not only with state unfair competition law but also with a federal statute.  It is therefore true that the Supremacy Clause does not, as in Sears, Roebuck & Co., 376 U.S. at 225, and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S. Ct. 779 (1964), operate to bar Section 43(a) from protecting trade dress in the form of the product configuration of Versa's B-316 valve.

found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain," Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 237, 84 S. Ct. 779, 782 (1964), is "an ever-present consideration," MᴄKᴇɴɴᴇʏ & Lᴏɴɢ, Fᴇᴅᴇʀᴀʟ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 5.03, at 5-25.

Furthermore, one expects a consumer exercising ordinary care to ascertain the source of a product to rely much more on packaging, trademarks, and advertising, which if not deceptive tend to reveal the product's source unambiguously, than on the product configuration, which usually does not contain an explicit statement of the producer's identity. While it might be shown that consumers in fact rely on a particular product's configuration to identify its source, such deviation from the normal pattern (i.e, from reliance on trademarks, packaging, and advertising) would be rare. Because clear labeling thus should generally be legally and factually sufficient to remedy confusion where unpatented product configurations are at issue, clarity of labeling (and marketing) must be taken into account in considering whether there is a likelihood that consumers exercising ordinary care will be confused as to the sources of substantially identical products.

Much as courts are required to police the boundaries of similarity within which a jury may be permitted to find a

likelihood of confusion under the Lanham Act, Country Floors, Inc., 930 F.2d at 1063, courts must also establish the perimeters of ordinary care that constrain likelihood of confusion. The following non-exhaustive considerations should guide a court's determination of the standard of ordinary care for a particular product. Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of a product, the more care that must be exercised in its selection. In addition, "the degree of caution used . . . depends on the relevant buying class. That is, some buyer classes, for example, professional buyers . . . will be held to a higher standard of care than others. Where the buyer class consists of both professional buyers and consumers, . . . . the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." Ford Motor Co., 930 F.2d at 293.

## 4. Actual Confusion or Lack Thereof (Scott Factors 4 & 6)

The fourth Scott factor is "the length of time defendant has used the mark without evidence of actual confusion arising." While we hold that this factor applies to product configuration cases as well as to trade mark and product packaging cases (for it is obviously relevant), we take this opportunity to underscore the role of the "lack of actual confusion" factor. If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be.

"Evidence of actual confusion" (the sixth Scott factor bearing on likelihood of confusion) is similarly relevant: the more evidence of actual confusion that a plaintiff can muster, the stronger the likelihood of confusion in the future, but lack of evidence of actual confusion (at least where the time period that the two products have been in competition is short or "when the particular circumstances [do not] indicate such evidence should have been available," AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 353 (9th Cir. 1979)) does not raise an inference that there is no likelihood of confusion. As the case law makes clear, proof of actual confusion is not required for a successful trade dress infringement action under the Lanham Act. Ford Motor Co., 930 F.2d at 292 (quoting Opticians Ass'n v. Independent

Opticians, 920 F.2d 187, 195 (3d Cir. 1990)); accord 2 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 23:2 (2d ed. 1984); id. § 23:20.

We see no reason that these factors would not also apply to product configuration cases. However, we emphasize again, see supra at 35-37, that to make out unfair competition a plaintiff must show a likelihood that a consumer exercising ordinary care to discover the identity of the source would suffer confusion or be mistaken because of the appearance of the allegedly infringing product configuration. Thus, instances of actual confusion may not weigh in favor of a finding of likelihood of confusion unless the confused consumer was acting with the care expected of consumers purchasing the type of good at issue. See G.D. Searle & Co. v. Hudson Pharmaceutical Corp., 715 F.2d 837, 840 & n.6 (1983) (ignoring testimony of witness who "was not acting as a reasonably prudent consumer of the type of goods in issue when purchasing the product").

## 5.  Defendant's Intent  (Scott Factor 5)

The fifth Scott factor is "the intent of the defendant in adopting the mark."  Whatever merit this factor may have in the context of trade mark and product packaging trade dress cases, we doubt that it is an appropriate consideration in a trade dress infringement case where the trade dress is alleged in the product configuration itself.  In the likelihood of confusion inquiry in trademark cases and product packaging trade dress cases, we do not focus on a defendant's bare intent to adopt a mark or product packaging substantially identical to a plaintiff's mark or packaging, since there is little basis in fact or logic for supposing from a defendant's intent to copy (without more) that the defendant's actions will in fact result in confusion.  Thus, what we have held is that a defendant's intent to confuse or deceive consumers as to the product's source may be highly probative of likelihood of confusion.  See American Home Prods. v. Barr Lab., Inc., 834 F.2d 368, 371 (3d Cir. 1987) (product packaging case -- color of pain relief medication); see also Fisons Horticulture, Inc., 30 F.3d at 479-80 (identifying "intent of promoting confusion and appropriating the prior user's good will" as appropriate inquiry in forward confusion cases) (internal quotation marks omitted) (trademark case -- marks "Fairway" and "Fairway Green"); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 960 (7th Cir. 1992) ("[T]he defendant's intent is relevant to the issue of likelihood of confusion only if he intended to palm off his products as those

of another." (internal quotation marks omitted) (trademark case -- words "Thirst Aid" used in advertising campaign); First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1385 (9th Cir. 1987) ("Intent of a defendant in adopting his trade dress is a critical factor, since if the trade dress were adopted with the intent of depriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is a confusing similarity.") (emphasis supplied) (product packaging case -- color and shape of antifreeze jug).

Because American Home Products involved a claim that the color of a rival producer's ibuprofen tablet infringed the trade dress of the plaintiff's Advil tablet, we believe that the case is closer to a product packaging case than a product configuration case. Even were we to consider it a product configuration case, however, American Home Products is consistent with our present discussion of defendant's intent. Judge Seitz's opinion did not hold that independent significance must be accorded a defendant's mere intent to copy; rather, it held that "intent to confuse might be highly probative of likelihood of confusion" and that "[a]t most, defendant's intent is a factor tending to suggest likelihood of confusion." American Home Prods., Inc., 834 F.2d at 371 (emphases supplied). In what follows, we simply clarify this circuit's intent-to-confuse rule for product configuration cases, delineating the circumstances under which a defendant's intent to confuse or deceive consumers

may be considered a factor in the likelihood of confusion inquiry.

We realize that some courts have adopted a broader rule holding that a defendant's intent to copy strongly supports an inference of likelihood of confusion. See, e.g., Bauer Lamp Co. v. Shaffer, 941 F.2d 1165, 1172 (11th Cir. 1991); Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987). Like the intent-to-confuse rule, this intent-to-copy rule relies essentially on a (rebuttable) presumption of efficacy -- although the intent-to-copy rule requires a double inference, see, e.g., Perfect Fit Indus., Inc. v. Acme Quilting Co., 618 F.2d 950, 954 (2d Cir. 1980) ("If there was intentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.") -- since the defendant's intent standing alone (without reference to the defendant's competence and the nature of the defendant's actions) reveals little about the probable outcome of the defendant's conduct.[14]

---

[14]. Thus we must disagree with one commentary, which, relying on case law (but not attempting to defend or explain its assertion), states: "Once intent to benefit or capitalize under Section 43(a) is found, the presumption or inference of likelihood of confusion logically ensues." McKENNEY & LONG, FEDERAL UNFAIR COMPETITION § 3.08[11][c] (emphasis supplied). Indeed, we note that this treatise contains a passage that, at least when generalized, illustrates the fallacy of the intent presumption: "the fact of likelihood of confusion [or lack thereof] among members of the relevant trade and purchasing public may be discerned by a court even if a defendant intended to realize a contrary result." Id. § 3.08[11][a].

The justification for these inferences in a trade mark or product packaging case is that there is little or no competitive need to copy another's distinctive symbol or presentation to sell one's product, and that anyone who does so is most likely trying to cash in on the competitor's good will attached to the competitor's mark or packaging in order to sell his or her own product. See, e.g., 2 MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 23.33 ("[W]e can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well known mark."). This presumption largely duplicates the weight given to the substantial-identity-of-appearance factor (Scott factor 1) in the likelihood of confusion inquiry, and the extra weight assigned to the intent to deceive is somewhat punitive. Cf. 2 MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 23.32 ("Where there is hard evidence of defendant's intention to get a free ride on plaintiff's reputation, the court is free to engage in the traditional rhetoric which accompanies punishing the evildoer[.]").

Although these two types of inference from defendant's intent do not directly serve the purpose of preventing consumer confusion or misappropriation of a producer's good will -- either of which might arise from good faith or bad faith actions -- the inferences may serve as a deterrent to infringement. But where product configurations are concerned, we believe there is little

room for deterrence if appropriate labeling and marketing are undertaken.

One primary purpose of the Lanham Act is to foster fair competition. See, e.g., Merchant & Evans, Inc., 963 F.2d at 640 n.13 (citing Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 193, 105 S. Ct. 658, 661 (1985), and Jay Dratler, Jr., Trademark Protection for Industrial Designs, 1988 U. ILL. L. REV. 887, 926 n.10). Indeed, we have said that prevention of unfair competition is the doctrinal basis for trade dress infringement suits under the Act. American Greetings Corp., Inc., 807 F.2d at 1140-41 & n.2. Where product configurations are concerned, we must be especially wary of undermining competition. Competitors have broad rights to copy successful product designs when those designs are not protected by (utility or design) patents. It is not unfair competition for someone to trade off the goodwill of a product, see Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 121, 59 S. Ct. 109, 115 (1938); it is only unfair to deceive consumers as to the origin of one's goods and thereby trade off the good will of a prior producer. See also Duraco, 40 F.3d at 1445.

Unless very narrowly tailored, deterrents to copying of product designs -- as opposed to product packaging or trademarks -- would inhibit even fair competition, thus distorting the Lanham Act's purpose. We believe that the best way to further Congress's intent is to limit carefully the scope of any possible

deterrence of competition.  Cf. Merchant & Evans, Inc., 963 F.2d at 640 ("[C]ourts should tailor trademark remedies to decrease the likelihood of confusion without unnecessarily inhibiting competition.").  Recognizing that trade mark and trade dress cases on one hand and patent cases on the other do not involve identical considerations, we nevertheless turn for guidance in this task to patent cases concerning defendants' intent, for, as we have noted, we must decide product configuration cases so as harmonize with the federal patent laws.  See supra at **Error! Bookmark not defined**.-36.

In patent infringement cases, a defendant's bad intent is relevant in at least two contexts.  First, under the doctrine of inequitable conduct, infringement claims may be rendered unenforceable if a plaintiff intended to deceive the Patent Office by failing to disclose material evidence.  See, e.g., Braun, Inc. v. Dynamics Corp. of America, 975 F.2d 815, 822 (Fed. Cir. 1992); Allen Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1567-68 (Fed. Cir. 1988).  Second, a plaintiff may receive increased damages where a defendant willfully infringed its patent.  See, e.g., Braun, Inc., 975 F.2d at 822; E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1440 (Fed. Cir. 1988).  In either case, however, the plaintiff must prove by clear and convincing evidence that the defendant had the relevant bad intent.  See, e.g., Braun, Inc., 975 F.2d at 822 (intent to deceive Patent Office and willful infringement); Allen

Organ Co., 839 F.2d at 1567 (intent to deceive Patent Office); E.I. du Pont de Nemours & Co., 849 F.2d at 1440 (willful infringement). Although in the present context we are not dealing with increased damages or actions taken by the Patent Office, product configuration trade dress cases nonetheless implicate patent-like restrictions on competition. Like the doctrine of inequitable conduct, a heightened evidentiary standard would serve to ensure that deviations from the "the federal policy . . . of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain," Compco Corp., 376 U.S. at 237, 84 S. Ct. at 782, are not casually countenanced. And much as the burden of proof for willful infringement assures that competitors are not penalized by increased damage awards without compelling evidence, we think it similarly important to competitors -- as well as the public -- that competition not be hobbled by monetary damages or injunctive prohibitions absent similarly compelling evidence.

Accordingly, for all the foregoing reasons, we hold that in the product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading. Of course, a plaintiff might succeed in proving likelihood of confusion without evidence of affirmative deception. We only hold that, to be considered as

evidence of a likelihood of confusion in a product configuration case, the defendant's intent must meet the conditions we have set forth.

## 6. Marketing Considerations (Scott Factors 7-10)

The remaining factors identified by Scott as bearing on the likelihood of confusion address various aspects of the marketing of the products. In the product configuration context, none of these four factors tends to establish a probability of confusion, rather than a mere possibility, and thus we conclude that they should be treated as necessary but insufficient conditions for showing a likelihood of confusion.

The seventh Scott factor is "whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media." We believe that this factor, which is explicitly formulated for application to non-competing products, serves primarily to establish the possibility of confusion and carries little weight toward establishing the probability of confusion; if not shown, it may exonerate a defendant, but if established, it merely allows the plaintiff's case to go forward. Moreover, it will rarely need to be considered in a product configuration trade dress infringement case, for the goods at issue will almost by definition be in competition.

"The extent to which the targets of the parties' sale efforts are the same" is the eighth Scott factor. Like the

marketing channel inquiry, this factor was developed largely for non-competing products, see, e.g., Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462-63 (3d Cir. 1983); Scott Paper Co., 589 F.2d at 1229-30, and relates more to the possibility than the probability of confusion. Particularly in a product configuration case, this factor should be considered necessary but not sufficient: If different consumers buy the defendant's product and the plaintiff's product, the defendant will typically win; if substantially overlapping audiences buy the products, the plaintiff does not automatically win, but will usually have the opportunity to further develop its case for likelihood of confusion.

"The relationship of the goods in the minds of the public because of the similarity of function" and "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market" are the ninth and tenth Scott factors for determining likelihood of confusion. Bearing in mind that these factors also were developed for non-competing products, we believe that they are largely superfluous in product configuration cases. The requisite similarity of trade dress in the product designs themselves would in most cases presuppose a similarity of function between the products at issue. Hence, some measure of so-called "competitive proximity" will always be present in product configuration trade dress infringement cases and therefore, while a necessary condition for

there to be a likelihood of confusion, this factor is not a sufficient condition, nor does it by itself create a strong presumption that confusion is likely to ensue.

### C. The Balance of the Modified Scott Factors Here

In this case, "[t]he dispositive issue is . . . consumer confusion as to source. Regardless of how much secondary meaning it possesses, a product's trade dress will not be protected from an imitator that is sufficiently different in its features to avoid such confusion." Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d at 151. For the reasons we explained above, we believe that the district court committed legal error in initially applying a "possibility of confusion" standard, and, applying the (modified) Scott factors, we conclude that it clearly erred in inferring from the evidence and testimony that an appreciable number of buyers are likely to be confused as to the origin of Bifold's Domino Junior valve. See CL 55, 62, 64.

### 1. The Governing Standard: Likelihood of Confusion

> The district court held that
> [a] lower standard for "likelihood of confusion" is applied where a newcomer to an area already occupied by a long established entity is the alleged violator. The Third Circuit uses the phrase "possibility of confusion" to describe this standard.

CL 56 (citations omitted). As we explained above, see supra at 23-28, this standard is inapplicable in product configuration cases. We decline, however, to reverse on this basis.

Although the district court announced the "possibility of confusion" standard in its Conclusions of Law, it appears that

the court might not have relied on the lowered threshold in finding for the plaintiff. None of the other "Conclusions" bearing on the issue of confusion included the "possibility" language; those that mentioned any measure used "likelihood" of confusion, the correct standard. Accordingly, in an excess of caution, we treat Conclusion of Law 56 as surplusage, and review the judgment for clear error with respect to the conclusion that Bifold's actions present a likelihood of confusion, Ciba-Geigy Corp., 747 F.2d at 851. We apply the Scott factors as modified, see supra Section II.B.

## 2. Viability of the District Court's Similarity Fact Finding

The district court correctly identified the similarity of product appearances (Scott factor 1) as the threshold inquiry in ascertaining likelihood of confusion. However, it improperly imported the trade mark/product packaging standard for the weight to be assigned this factor, holding that "if the overall impression created by the trade dress is essentially the same, it is very probable that the products are confusingly similar." From there, it apparently reasoned that because "[t]he overall appearance of the Versa B-316 valve and the Bifold Domino Junior valve is virtually identical[,] there is a likelihood of confusion." See also CL 64 ("Bifold Domino Junior valves have a very similar appearance to Versa B-316 valves; there is a likelihood of confusion.").

Despite the appreciable differences between the valves' appearances, see supra at 10-11, we do not hold the district court's finding of similarity of appearance to be clearly erroneous.  But in a product configuration case, the similarity of the product designs does not alone give rise to a strong inference of likelihood of confusion, see supra at 30-32, since the greatest weight must be given to the primary means by which consumers identify the products' sources:  packaging, trademarks, and advertising.  Accordingly, the similar appearance of the two valves' designs allows Versa to argue -- but does not establish -- a likelihood of confusion.  The district court's findings concerning the trade channels and advertising media used by Bifold and Versa (Scott factor 7) and Bifold's targeting of the same customer group (Scott factor 8) similarly do little to establish likelihood of confusion.

### 3. Intent, Competitive Proximity, and Likelihood of Confusion

Compounding its error regarding the effect of the similarity of the valves' appearances, the court asserted that "[a]n intent to copy trade dress and/or finding of copying by a junior user is often alone dispositive of a finding of likelihood of confusion." Even as concerns trade marks and product packaging, however, only an <u>intent to deceive or confuse</u> consumers can suffice to raise a presumption of likelihood of confusion in this circuit. <u>See</u> <u>supra</u> at 41. Moreover, in a product configuration case the defendant's intent (<u>Scott</u> factor 5) is not relevant to the issue of likelihood of confusion absent affirmatively misleading labeling and marketing. Here, Bifold's identification of its Domino Junior valves is by no means misleading, <u>see</u> <u>supra</u> at 11; <u>infra</u> at **Error! Bookmark not defined.**–65, and thus Bifold's intent should not be considered.

Similarly, the district court erred in holding that "[w]hen products are used in the same application, such a competitive proximity of goods <u>strongly</u> favors a finding of likelihood of confusion" (emphasis supplied). This proposition finds no support in the two decisions of this court cited by the district court, <u>see</u> <u>Interpace Corp.</u>, 721 F.2d at 462; <u>Scott Paper</u>, 589 F.2d at 1229, and at all events it is not applicable where trade dress consists in a product configuration, as our previous discussion explains. <u>See</u> <u>supra</u> at **Error! Bookmark not defined.**.

4.  Strength of the Trade Dress and Likelihood of Confusion

Turning to the <u>Scott</u> factors that <u>are</u> relevant to the likelihood of confusion in this product configuration case, we first note that the "strength" of Versa's trade dress in its B-316 valves' configuration (<u>Scott</u> factor 2) may not support a conclusion of likelihood of confusion because there is no evidence that consumers rely on the appearance of the B-316 valve to identify it.  <u>See</u> <u>supra</u> at 33-34.  To the contrary, all the evidence shows that consumers order valves by multi-digit part and model numbers peculiar to the manufacturer.  In selecting the valves buyers do not specify the desired appearance but rather designate functional specifications listed in schematic diagrams, specification sheets, and manufacturers' catalogues.  Such precision in ordering is necessary, for Versa offers many variations of its valves.  Thus, the "strength" of the B-316's trade dress does not bolster Versa's case for a likelihood of confusion.

## 5. The Evidentiary Role of Actual Confusion

This brings us to evidence of actual confusion (<u>Scott</u> factor 6) or the lack thereof (<u>Scott</u> factor 4). The district court correctly noted that Versa need not prove actual confusion, only a likelihood of confusion. Although the district court did not address the pertinent evidence in its Conclusions of Law or explicitly rely there on evidence of actual confusion, we will address the Findings of Fact arguably relevant to actual confusion that might support the district court's conclusion of likelihood of confusion. Our examination confirms that the district court's ultimate conclusion was clearly erroneous, not supported by record evidence, let alone evidence cited anywhere in the opinion.

The district court commenced the "Likelihood of Confusion" section of its Findings of Fact by discussing Bifold's "sole sales representative in the United States."  The court found (and there is record evidence to support) that Bifold hired James Carr, III, a former Versa regional marketing manager; that Carr has already tried to sell Bifold products to Gordon Fraleigh, a Versa distributor who knew Carr for a number of years while Carr was a regional sales manager for Versa; and that Carr told Fraleigh that the Bifold valve was an "exact copy" of the Versa B-316, as a result of which there was confusion in Fraleigh's (heightened by Carr's former relationship with Versa) mind as to the relationship between Versa and Bifold.

This depiction of the facts, however, is misleading.  It presents only a snapshot of Fraleigh's mental processes, taken from a particular angle at a single instant in time.  Examining Fraleigh's uncontested testimony from a different angle reveals the situation more fully:  First, the telephone call in question occurred sometime around the early part of 1993, but Fraleigh knew that Carr left Versa's employ in 1990.  Thus, at the time of this call, Fraleigh knew Carr was not with Versa; indeed, during the call, Carr told Fraleigh that he was with Bifold, an English company, and he did not say that Bifold was connected with Versa or that its valves were made by Versa.  Second, Fraleigh's employer, the Fraleigh Company, distributes the products of about

seventy companies, including Versa, and before the call in question Carr had phoned Fraleigh representing various non-Bifold product lines competitive with Versa. Fraleigh was apparently confused only because he had not previously seen duplicate products in the fluid power industry and because Carr had once been a Versa representative.

Moreover, a slightly broadened temporal focus exposes the manifest error in the district court's fact finding. Initially, we note that Fraleigh's testimony reveals that he did not even know whether Carr was referring to Bifold's Domino Junior valve. Nor did Fraleigh see the valve, for he and Carr conversed by telephone. Fraleigh's testimony, then, cannot be evidence that the appearance of the Domino Junior was so like Versa's trade dress that it would confuse consumers as to the sources of the valves. Furthermore, Fraleigh testified that, because of his confusion, he called Versa Products to find out what was going on. Versa's sales manager, Joe Sudol, explained that Bifold was a competing company from England that had copied the B-316. Indeed, he asked Fraleigh to try to get information on Bifold's valve.

Plainly, then, Fraleigh's testimony does not represent an instance of "actual confusion." It reflects only fleeting uncertainty as to the relationship between Bifold and Versa, not a mistaken belief that there was any affiliation between the two companies. Fraleigh was able with minimal effort to procure the

modicum of information he needed to dispel his uncertainty.[15]  We believe that Fraleigh acted as a prudent distributor-customer of these sorts of valves, and as a result was not confused in the Lanham Act sense.[16]

---

[15].    In the absence of evidence to the contrary, it is also most likely that Carr himself would have told Fraleigh the truth -- that Bifold is an unaffiliated competitor of Versa -- had Fraleigh asked.  Courts may not simply presume that individuals will lie in direct violation of trademark and unfair competition laws.  Indeed, Versa's counsel conceded that "I'm not and cannot offer to this Court that we have proof of a distributor that has done that [i.e., falsely indicated that Bifold is associated with Versa's products]."  Nor did Versa even offer other instances in this industry where such misrepresentation had occurred.  (Versa Vice-President and Chief Operating Officer Frank Vetter opined only that "it becomes very easy for a Bifold perhaps distributor [sic] to go in and, as you might hear later on in testimony, [say] that this valve is a direct interchange with a Versa valve, it fits in the same place, it performs the same function."  This is a far cry from evidence that distributors mispresent the sources of the valves they sell.  The district court therefore correctly characterized such testimony as "highly speculative," and Versa's expert witness Gerald Murphy as not qualified to "opine as to whether somebody's going to lie or not."

Pharmaceutical cases relying on possible substitution of one maker's drug for another by pharmacists filling prescriptions are not to the contrary.  In such cases, the finding of likelihood of confusion is supported by evidence that improper substitution commonly occurs in prescription filling, and that the minuscule markings on pills with similar trade dress are sufficiently difficult to read by many customers that the markings do not reduce the likelihood of confusion.  See, e.g., SK&F, Co., 625 F.2d at 1059 & n.2, 1061.

[16].    Thus, aside from its bearing on the channels of trade and target audiences, see supra at 48-49, evidence that Carr has still been able to get access to Versa valve products and has recently sold Versa valves to the same customers to whom he will be selling Bifold valves is irrelevant to likelihood of confusion.

### b. The Wentworth Fax Reflects No Actual Confusion

Second, the district court asserted that at least one customer has forwarded to Bifold a telefax that was initially addressed to Versa. The fax from Trevor Wentworth opened with the following statement: " Derek reference our telecon this morning here are the requirements for the above referenced project." The <u>original</u> addressee was Versa, "Attention: Dave," and after those names were crossed out, the same fax was sent to Bifold, "Attention: Derek Close"; the fax number -- "Auto" -- was unchanged. But this fax may have been a request for competitive bids,[17] including only Versa's part numbers because Wentworth had spoken to Bifold's sales representative by telephone and had not yet been sent any spec sheets; or (although unlikely) it might reflect a customer so befuddled that he could not remember to whom he had spoken that morning, and thus not a customer exercising ordinary care. At all events, there is no evidence that the customer had even seen the appearance of Bifold's Domino Junior valve to be able to confuse it with Versa's trade dress on its B-316 valve. For these reasons, and because there was no testimony at trial concerning this unexplained fax, the district court clearly erred when it used this evidence to buttress its conclusion that there was confusion -- actual or likely -- as to the sources of the valves or the relationship (or lack thereof) between Versa and Bifold.[18]

---

[17]. Bifold explains on appeal, and Versa does not contest, that the fax "was a request for a price quote, and the customer

        c.      The Hearsay Evidence Constitutes No Evidence of
Confusion

(..continued)
was seeking competitive bids."  Br. of Appellant, at 38.  We do
not, however, determine that this explanation is true; rather, we
cite it only as a possibility.  There was no explanation offered
at trial, for the district court at the outset admitted (without
discussion) all documentary evidence appearing on a list prepared
by either party and not objected to.

        [18].      Since the fax referred to B-series and V-series valves
and was sent initially to Versa, we believe that the competitive
bid explanation is the only plausible one in the absence of
evidence to the contrary.  By contrast, a fax sent initially to
Versa but asking for a quote on Domino Junior valves would
suggest confusion.

Third, the district court erred in relying on hearsay evidence for the proposition that there was actual confusion. The district court recorded as a finding of fact that "When Mr. Frank Vetter was asked by Bifold's attorney for examples of actual confusion between Bifold's Domino Junior valve and Versa's B-316 valve, Mr. Vetter related that he had been advised of confusion at trade shows." We agree that the record reflects Vetter's response. But his answer is pure hearsay: Vetter's testimony upon which the district court relied was that "I have been advised by our sales manager in Europe that there was confusion at trade shows, that people had indicated that the valves resembled, were identical and they would lead to confusion." Vetter could not even identify the people allegedly confused, instead referring Bifold's attorney to "the brief." Moreover, Vetter's response only proves that people thought the valves' appearances were similar, not that they were actually confused by the similar appearances. In this light, even if Vetter's testimony were not hearsay, it still would not demonstrate confusion as to the sources of the valves engendered by the similarity in appearance of the valves.

The district court similarly erred in making a finding of fact that "Hans Albert, Sales Manager for Versa, B.V., substantiated that he had discussions with people at the Stavanger, Norway trade show regarding the issue of confusion, including Mr. Ellingston of Hark & Ellingston, a major competitor

in Norway[,] and Mr. Ungerskruge, an employee of a company named Holter that manufacture[s] wellhead control panels." Again, this testimony is hearsay, to which Bifold objected. Versa then offered it solely to prove that Alberts had a conversation with two identifiable people, and the district court ruled that Albert's testimony must not concern the substance of the conversation. Accordingly, this testimony has no bearing on the issue of the likelihood of consumer confusion as to the sources of the valves, and it was therefore error for the district court to include it as the basis for a finding of fact. Even were the substance of the testimony admissible, Vetter testified only that he spoke with people "with regard to the issue of confusion." Thus, the testimony is not probative of a likelihood of confusion as to source as a result of the alleged trade dress infringement.

d.  Summary Concerning Actual Confusion

In sum, we believe that there was no evidence of actual consumer confusion as to source upon which the district court could have relied to find a likelihood of confusion.  Moreover, as the district court found, "[o]nly two Domino Junior valves have been sold to date in the United States and those have been sold to Versa's sales representative so that there has been little, if any, opportunity to develop evidence of further confusion in the United States."  Accordingly, evidence of actual confusion or lack thereof does not weigh in favor of or against a finding of likelihood of confusion.  We turn to the final relevant Scott factor.

6.  Labeling, Care Expected of Consumers, and Likelihood of Confusion

As noted above, the third Scott factor is "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase."  As we have described, this factor is fundamental in product configuration cases, where the most important facts are the marketing and labeling of the similarly configured products.  As we now explain, the district court clearly erred in not finding these factors dispositive in this case.

The district court was technically correct in stating that "[t]he fact that the source of the product is clearly designated on the product does not establish that plaintiff has failed to demonstrate a likelihood of confusion as such an element is

simply one factor to be assessed when resolving the confusion issue." However, it failed to appreciate the converse proposition, that a court need not consider all these elements when some are dispositive. See Freixenet, S.A., 731 F.2d at 151-52. Here, as the court properly observed, "[i]n selling a competing valve, Bifold's duty is to take reasonable steps to prevent deception." Under the circumstances, Bifold more than adequately met its duty to take reasonable steps to prevent deception.

### a. Bifold's Extensive Labeling Precludes Likelihood of Confusion

Although the configurations of Versa's B-316 and Bifold's Domino Junior valves are quite similar in appearance, we deal here with a product configuration case, and thus the labeling of the products takes on a heightened importance. See supra at **Error! Bookmark not defined.**-32. The facts found by the district court clearly show that Bifold took entirely reasonable and adequate steps to prevent confusion.

The district court found that "[t]he name VERSA and the place of origin, `N.J., U.S.A.,' are cast into the metal [of the B-316 valve body] to identify Versa as the valve's source." Moreover, "[e]very valve body that Versa sells bears a label displaying the VERSA name, logo and part number." Similarly, the court noted that "Bifold casts its name into the DOMINO JUNIOR valve body, and bolts onto the body a metal label displaying the BIFOLD name."

But this brief recitation fails to convey the adequacy of Bifold's efforts. "In the case of a relatively high-priced, single-purchase article, . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed." Merchant & Evans, Inc., 963 F.2d at 636 (internal quotation marks omitted); see also Bose Corp., 467 F.2d at 310 (same). Here, the metal label bolted onto the Domino Junior valves does more than "display[] the BIFOLD name." The name appears in a logo of sorts in a font markedly different from that used in the Versa logo. The label also contains Bifold's part number and a valve serial number, the place of origin (Wigan, England), Bifold's telephone number, and its fax number. Moreover, this is not a case where "[t]he items are relatively inexpensive and consumers cannot be expected to examine the labels carefully," Scott Paper Co., 589 F.2d at 1230, and even a quick glance at the permanently affixed label reveals that Bifold is the source of the Domino Junior valve. Thus, Bifold's labeling will suffice to dispel any confusion about the valve's source that the configuration of the Domino Junior valve might otherwise engender in purchasers who exercise ordinary care.

b. The Manner in Which the Valves Are Sold Virtually Precludes Likelihood of Confusion

In addition to the clear labeling, the manner in which the valves are marketed further nullifies any likelihood of confusion. As the district court found:

> The Versa B-316 and Bifold DOMINO JUNIOR valves are not sold on a shelf or selected on sight. Buyers order the valves

based on functional specifications as shown on schematic diagrams, manufacturer's catalogs or specification sheets and samples available at trade shows and sales presentations.

Moreover, purchasers cannot buy Versa B-316 or Bifold Domino Junior valves by name only. B-316 valves can be purchased only by specifying a multi-digit part number pursuant to Versa's comprehensive part numbering system. Similarly, Bifold requires the use of its own part numbering system, with the numbers obtainable only by reference to a Bifold specification sheet. Finally, as the district court also found, "[t]he purchasers and users of Versa's B-316 valves are qualified, knowledgeable personnel who understand how the valves are to be installed and operated."

The appearance of these valves simply plays no role in the ordering process, which instead requires the use of detailed technical specifications and lengthy, manufactuer-specific part numbers. Under these circumstances, we find it utterly inconceivable that one of -- let alone an appreciable number of -- the professional buyers of these valves will be confused, by the appearance of the Domino Junior, as to the valves' manufacturers or the relationship between them.

c. Summary of the Labeling and Care Expected of Consumers

The foregoing evidence must be viewed as virtually precluding any likelihood of confusion. These valves are not bought by children or casual consumers, nor are they purchased solely by name. There is no likelihood of confusion -- indeed,

virtually no possibility that the appearance of the Bifold Domino Junior valve body will mislead purchasers into thinking that they are ordering a Domino Junior valve from Versa or a B-316 valve from Bifold, and the enormous safety concerns surrounding the applications where these valves are used increase the already great care used by purchasers of these valves.[19] Typically, they are found in offshore oil drilling control applications, hazardous and demanding environments where loss of human life, major environmental damage (and consequent liability), and huge property loss may be at stake if a valve does not function properly in an emergency shutdown. Because of the dire consequences of using an improper valve, engineers who design the control panels would be expected to exercise a high degree of caution in selecting valves, and thus would be highly unlikely to mistake a Versa B-316 for a Bifold Domino Junior.

Therefore, in light of the importance of the valves, the process by which they are purchased, the sophistication of the consumers, and the clarity of Bifold's labeling, there is no likelihood (or even a realistic possibility) of consumer confusion as to the source of Versa's or Bifold's valves, and we

---

[19]. Although Versa intended its witnesses' testimony to highlight the hazards of confusing a Versa valve with a Bifold valve -- which would be product confusion, not source confusion as required for a Lanham Act violation -- the testimony is nonetheless indicative of the care that ordinarily prudent valve consumers may be expected to use.

conclude that the district court's contrary finding was clearly erroneous.

## 7. Private Labeling Theories Do Not Support Likelihood of Confusion

We must still address one additional theory under which the district court found a likelihood of confusion: the private labeling theory. The district court concluded, ostensibly as a finding of fact, that

> [g]iven the virtual identity in appearance of the Versa B-316 cast valve and the Bifold DOMINO JUNIOR cast valve and the fact that Bifold has not previously sold products in the United States, anyone in the industry might reasonably assume that Versa had manufactured but privately labelled the Bifold DOMINO JUNIOR valve or that the DOMINO JUNIOR valve is otherwise associated with Versa.

FF 232. The court further concluded that

> [t]he 'second comer" Bifold DOMINO JUNIOR valve looks so similar to the established Versa B-316 valve that it looks like a private label manufactured by Versa. The two valves could be confused; consumers would think that there is some relationship between the two valves and two companies.

FF 233 (citations omitted). Although we believe that these conclusions present mixed questions of fact and law, for the district court focused upon what consumers might "reasonably" assume, we need not invoke plenary review, for we are firmly convinced that they represent clear error, and that the theory of confusion in which they are grounded does not support a claim under the Lanham Act or New Jersey law.

In FF 232, the district court concluded from coincidence of similarity of appearance and recency of entry into a market that

consumers might reasonably assume private labelling or some other relationship between the Domino Junior and Versa valves. The district court is correct that the Lanham Act protects against confusion not only as to source but also as to connection between manufacturers of similar products. See, e.g., Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1007 (3d Cir. 1991). But the court's inference would potentially subject any new competitor with a product whose appearance resembles that of an established product to an injunction on this private labeling theory. We have simply been presented with no evidence that "private labeling" occurs today on a scale significant enough to justify such a sweeping extension of the law of unfair competition.

Even a presumption of more limited scope would not support the district court's inference. Where product configurations are at issue, consumers are not generally likely to jump to the "private labeling" conclusion; consider for example Oreo and Hydrox brand sandwich cookies, which are strikingly similar in appearance. Consumers would not have assumed upon later emergence of one brand that the first producer had marketed a slight variation of its cookie under a private label. Rather, as in situations like the present one, consumers generally are more likely to conclude, quite reasonably, that a competitor has entered the market with a substantially identical product.

Second, the record evidence does not support the district court's conclusion. Versa's counsel's opening statement at trial fairly summarized the content of Gerald Murphy's testimony, which formed the sole evidentiary basis for the district court's private labeling conclusion:

> Mr. Murphy [Versa's expert witness] will also tell that as a result of his experience, look-alike products are naturally associated by way of operating characteristics and reputation. Just because the valves look alike, the Bifold Domino Junior valve will command attention from sales representatives and others that it would not otherwise obtain. That it will get sales opportunities from people in this industry that otherwise would not be available to the Bifold Domino Junior product, except for the fact that the Bifold Domino Junior product looks exactly like the Versa B-316 product and is then able to trade off the reputation of the Versa B-316 product.

What Versa and the district court have failed to come to grips with is the precept that "[e]xploiting the `goodwill of the article,' Kellogg Co., 305 U.S. at 121, 59 S. Ct. at 115 -- the attractive features, of whatever nature, that the product holds for consumers -- is robust competition; only deceiving consumers, or exploiting the good will of another producer, is unfair competition." Duraco, 40 F.3d at 1445 (one emphasis omitted). Moreover, and most importantly, all of Murphy's non-speculative testimony supported (as Versa said in its opening) a finding of exploitation of the goodwill of, at most, the Versa B-316 product, not the Versa identification itself.

Murphy testified about past situations where misfortunes involving valves of one producer led to sales difficulties for other manufacturers of similar valves. He did not testify about

incidents where one producer copied another's trade dress, but rather about instances where negative perceptions associated with a particular type of valve were transferred to valves of the same type made by other manufacturers. Thus, his testimony showed the possibility of the ill will of one valve's diminishing the good will of a similar valve. But even had Murphy testified that the valves he was discussing had confusingly similar trade dress -- which he did <u>not</u> -- that would not suffice to show that consumers abandoned the type of valve that had manifested defects because they thought all valves of that type came from related sources. Rather, consumer may have abandoned the valves because they assumed that all valves of a similar type shared "operating characteristics."

It is true that in <u>Badger Meter, Inc. v. Grinnell Corp.</u>, 13 F.3d 1145 (7th Cir. 1994), the Court of Appeals for the Seventh Circuit relied in part on a private labeling theory to uphold a finding of likelihood of confusion in a trade dress infringement suit by a water meter manufacturer against a competitor who copied the appearance of one line of meters. There, however, the defendant was <u>known within the relevant market</u> to have previously sold water meters of another manufacturer under its own label. <u>Id.</u> at 1152. Here, in contrast, there is no evidence that Bifold is known in the American market as having a history of selling other valve manufacturers' products under its own label. Thus Versa may not rely on the inference that consumers familiar with

an established defendant with a known history of private labeling will assume that it is selling an established plaintiff's product under a private label agreement.

Unable to avail itself of the Badger Meter inference, Versa attempts to ensnare Bifold by arguing that because Bifold is not yet known in the American market, valve purchasers may assume that Versa has manufactured the Domino Junior but is selling it under a private label. A rule sanctioning this inference would tend to strangle competition by adopting what is in essence a presumption that consumers will believe an established business has a greater market share than it really does. The district court's conclusion that "anyone in the industry might reasonably assume that Versa had manufactured but privately labelled the Bifold DOMINO JUNIOR valve or that the DOMINO JUNIOR valve is otherwise associated with Versa," represents a dramatic extension of the law of unfair competition, one which we cannot believe that Congress intended or that New Jersey would adopt.

We doubt that a company truly concerned about the quality of its valves and its putatively distinctive product configuration would use private labeling. The use of private labeling undermines a claim that a product's appearance denotes its source, because consumers will be less likely to associate the multifariously labeled product with a single source. See, e.g., Tone Bros., Inc. v. Sysco Corp., 23 U.SP.Q.2d 1184, 1190-91 (S.D. Iowa 1992), and cases cited therein. And if Versa were to

contend that all the purchasers know that in fact Versa manufactures the valves identified by a private label, we are not certain what the private labelling would accomplish. Moreover, it would seem that any manufacturer employing private labeling for its product necessarily exercises control over that practice, and if it is the plaintiff's actions that cause the confusion, the plaintiff will not be heard to complain. Cf. Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 676 (3d Cir. 1989) (Becker, J., concurring) ("[The plaintiff] has in effect engineered the possibility of a likelihood of confusion and therefore infringement in this case. This is not the sort of injury trademark infringement actions under the Lanham Act were intended to remedy."). We decline to establish a rule that would allow a plaintiff to expand its own rights by using private labeling to assure a design monopoly even despite adequate labeling by competitors.

We have explained elsewhere that "the primary concern [behind the trademark act] was to protect consumers and trademark holders from spurious imitations." Id. at 673 (Higginbotham, J., for the court). Where, as here, a second comer has taken steps to conspicuously label its product (however similar to that of an established manufacturer), the newcomer has hardly represented its product to be that of its competitor, and so has not offered a "spurious imitation." Thus, even if there were evidence that Versa uses private labeling, we do not believe that it could form

the basis for a finding of likelihood of confusion. As it is, however, there is absolutely no evidence that Versa or any other competitor of Bifold's in the offshore oil well industry uses private labeling. Accordingly, the district court clearly erred when it accepted Versa's argument that Bifold's labeling will not prevent consumer confusion.[20]

## IV. CONCLUSION

To have prevailed in its action for trade dress infringement, Versa needed to show the existence of a likelihood that an appreciable number of consumers of the relevant type of valves would probably be confused as to the source of Bifold's Domino Junior valve or its affiliation (or lack thereof) with Versa. Upon reviewing the trial record, with due regard for the labeling actually used by Bifold, we conclude that Versa failed to meet its burden, and that the district court's finding that Versa had shown a likelihood of confusion is clearly erroneous. We therefore will reverse the order of the district court, and vacate the permanent injunction and award of attorneys' fees against Bifold.

---

[20]. New Jersey's commmon law and statutory prohibitions of unfair competition (which address, inter alia, "passing off" one's goods as those of another manufacturer and unprivileged imitation) generally parallel the federal cause of action for unfair competition under section 43(a) of the Lanham Act. See SK&F, Co., 625 F.2d at 1065 (3d Cir. 1980). Thus, "private labeling" does no more work for Versa under its state law unfair competition claim (see supra at 2, 22 & n.10) than it does under federal law.